*United States v. Omotayo*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2023

(Argued:  February 6, 2024     Decided: March 20, 2025)

Docket No. 22-1035

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

TEMITOPE OMOTAYO ,

*Defendant-Appellant,*

OLALEKAN DARAMOLA, SOLOMON ABUREKHANLEN, GBENGA OYENEYIN, ABIOLA
OLAJUMOKE, BRYAN EADIE, ALBERT LUCAS, ADEMOLA ADEBOGUN, LUCAS OLOGBENLA,
ADEWOLE TAYLOR, CURLTEN OTIDUBOR, *and* OLUWASEUN ADELEKAN,

*Defendants.*[*]

B e f o r e :

LEVAL, CARNEY, and SULLIVAN, *Circuit Judges*.

---

[*] The Clerk of Court is directed to amend the official case caption as set forth above.

Omotayo, along with at least eleven co-conspirators, participated in an international scheme aimed at defrauding businesses in the United States. For his role in the fraud, Omotayo was convicted by a jury on charges of conspiracy to commit wire fraud and money laundering. He concedes that substantial evidence supported those convictions.

The sole question before us is whether, in the course of the wire fraud conspiracy, Omotayo also violated a federal law criminalizing "aggravated identity theft," 18 U.S.C. § 1028A, which carries with it a mandatory consecutive two-year prison term. At trial, the government showed that Omotayo possessed and sent a co-conspirator two versions of a single counterfeit invoice, both of which included the real name of another person. It presented no evidence that the invoice was otherwise used in the scheme. The jury was instructed, as relevant here, that it could find Omotayo guilty of aggravated identity theft if the invoice had "a purpose, role, or effect with respect to the [wire fraud conspiracy]." It convicted Omotayo on that count. Omotayo appealed.

Soon after Omotayo's conviction, the Supreme Court decided *Dubin v. United States*, 599 U.S. 110 (2023). *Dubin* established that Section 1028A applies only where a "defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal[.]" *Id.* at 114. On appeal, Omotayo argues that his possession and transfer to a co-conspirator of the invoice in connection with one transaction was not "at the crux" of the underlying fraud.

For the reasons set forth in our opinion, we agree with Omotayo: in light of *Dubin*, Omotayo's conviction cannot stand. First, the jury was instructed to apply a legal standard that is now plainly incorrect. *Henderson v. United States*, 568 U.S. 266, 273-74 (2013) ("[A]n error is 'plain' even if the trial judge's decision was plainly *correct* at the time when it was made but subsequently becomes incorrect based on a change in law."(emphasis in original)). Second, even if the jury had been correctly instructed under *Dubin*, the government's evidence was insufficient to show that Omotayo's possession or transfer of the invoice played a key role in the wire fraud scheme. We therefore REVERSE Omotayo's judgment of conviction as to the aggravated identity theft charge, and REMAND the case for further proceedings not inconsistent with this opinion. The Clerk is directed to issue the mandate forthwith.

Judge SULLIVAN dissents in a separate opinion.

REVERSED AND REMANDED.

REBECCA T. DELL, Assistant United States Attorney (Daniel H. Wolf and David Abramowicz, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for the United States of America*.

MATTHEW J. KLUGER, Law Office of Matthew J. Kluger, Bronx, New York, *for Defendant-Appellant Temitope Omotayo*.

CARNEY, *Circuit Judge*:

Omotayo, along with at least eleven co-conspirators, participated in an international scheme aimed at defrauding businesses in the United States. For his role in the fraud, Omotayo was convicted by a jury on charges of conspiracy to commit wire fraud and money laundering. He concedes that substantial evidence supported those convictions.

The sole question before us is whether, in the course of the wire fraud conspiracy, Omotayo also violated a federal law criminalizing "aggravated identity theft," 18 U.S.C. § 1028A, which carries with it a mandatory consecutive two-year prison term. At trial, the government showed that Omotayo possessed and sent a co-conspirator two versions of a single counterfeit invoice, both of which included the real name of another person. It presented no evidence that the invoice was otherwise used in the scheme. The jury was instructed, as relevant here, that it could find Omotayo guilty of aggravated identity theft if the invoice had "a purpose, role, or effect with respect to the [wire fraud conspiracy]." It convicted Omotayo on that count. Omotayo appealed.

Soon after Omotayo's conviction, the Supreme Court decided *Dubin v. United States*, 599 U.S. 110 (2023). *Dubin* established that Section 1028A applies only where a "defendant's misuse of another person's means of identification is at the crux of what

makes the underlying offense criminal." *Id.* at 114. On appeal, Omotayo argues that his possession and transfer to a co-conspirator of the invoice in connection with one transaction was not "at the crux" of the underlying fraud.

For the reasons set forth below, we agree with Omotayo: in light of *Dubin*, Omotayo's conviction cannot stand. First, the jury was instructed to apply a legal standard that is now plainly incorrect. *Henderson v. United States*, 568 U.S. 266, 273-74 (2013) ("[A]n error is 'plain' even if the trial judge's decision was plainly *correct* at the time when it was made but subsequently becomes incorrect based on a change in law." (emphasis in original)). Second, even if the jury had been correctly instructed under *Dubin*, the government's evidence was insufficient to show that Omotayo's possession or transfer of the invoice was at the crux of what made the wire fraud scheme criminal. We therefore REVERSE Omotayo's judgment of conviction as to the aggravated identity theft charge, and REMAND the case for further proceedings not inconsistent with this opinion. The Clerk is directed to issue the mandate forthwith.

## BACKGROUND

### I. Arrest and Indictment

On April 25, 2019, Temitope Omotayo and eight co-defendants were arrested under a one-count federal indictment that charged conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 ("Count One"). The conspiracy was allegedly carried out from at least July 2016 through April 2019. All told, the government alleged, the co-conspirators—as finally charged, there were twelve—attempted to steal more than $10 million from at least 46 victims. Their victims suffered losses of more than $6 million.

On September 9, 2021, just over a month before trial, the government filed a Fourth Superseding Indictment ("S4"), adding two new charges against Omotayo and some of his co-conspirators: conspiracy to commit money laundering, in violation of 18 U.S.C.

§ 1956(h) ("Count Two"); and aggravated identity theft, in violation of 18 U.S.C. § 1028A ("Count Five"). It is the aggravated identity theft charge that is at issue in this appeal.

Under Section 1028A, an individual commits aggravated identity theft by "knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person," when doing so "during and in relation to" certain enumerated felonies, including wire fraud. *See id.* § 1028A(a), (c). For purposes of Section 1028A, "means of identification" is broadly defined to include "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual[.]" *Id.* § 1028(d)(7). Any person found guilty of aggravated identity theft must be sentenced to a mandatory term of imprisonment of two years. *Id.* § 1028A(a)(1). This term must be served consecutively to any term of imprisonment imposed for a different federal offense, including the predicate Section 1028A felony. *Id.* § 1028A(b)(2).

Count Five of S4 alleged that Omotayo and a co-defendant, Bryan Eadie, "possessed and used the name and employer of another person . . . without [that person's] authorization, in attempting to obtain through fraud the proceeds of a wire transfer, during and in relation to the conspiracy to commit wire fraud charged in Count One of [the] Indictment[,]" thereby violating Section 1028A and subjecting them to a mandatory two-year consecutive sentence. App'x 50.

## II.    Trial

The government tried Omotayo jointly with Oluwaseun "Sean" Adelekan, his cousin and co-defendant. At trial, as detailed below, the government presented text messages exchanged by Omotayo and some of his co-conspirators; financial records from bank accounts controlled by the conspirators; testimony by victims of the fraud; and the testimony of two cooperating witnesses, who described the particulars of Omotayo's participation in the conspiracy.

5

A.    The Structure of the Conspiracy

The government's witnesses described how participants in the scheme played one of three roles: in the group's terminology, these were called the "Plug," the "Scout," and the "Connect." App'x 166-67. A "Plug" would communicate with targeted victims and attempt to persuade them to transfer money to the conspirators. Plugs used several techniques to trick their victims, including romance scams, investment scams, and, as pertinent here, business email scams. In a business email scam, a Plug would pose as the employee of a legitimate business and attempt to persuade actual employees of that business or of its business partners to issue payments to bank accounts controlled by the conspirators.

The conspirators used accounts at legitimate U.S. banks to receive and hold the stolen funds. Maintaining a sufficient number of accounts at such banks, however, proved a challenge: banks would sometimes flag transfers as suspicious and freeze the accounts. When this occurred, the conspirators turned to their "Scouts." Scouts were assigned to identify individuals who had or were willing to open U.S. business bank accounts that the conspirators could use to perpetrate frauds or hold the proceeds.

Finally, the "Connects" served as middlemen between the Scouts and the Plugs, handling communications between the two. Connects also provided Scouts with instructions on how to divide the fraud's proceeds.

B.    Omotayo's Participation in the Conspiracy

On February 24, 2017, Omotayo came to the United States from Nigeria on a two-year work visa. He initially travelled to Chicago to visit relatives, but later moved to New York, where he found work in several factories. By the time Omotayo arrived in the United States, the conspiracy was underway, and Adelekan, Omotayo's cousin, was

already an active participant. The record is unclear as to how Omotayo's involvement began. By May 2017, however, Omotayo had joined Adelekan in the scheme.

Bryan Eadie—who by the time of trial had become a cooperating witness—testified that Omotayo was a Connect, i.e., that he was responsible for facilitating the transfer and division of fraudulent funds in any particular transaction by passing information between the relevant Plug and the Scout. The government presented evidence that, after a Plug had persuaded a victim to transfer funds, Omotayo would notify Scouts that they should expect to receive wire transfers of funds into their business bank accounts. Then, after the money arrived, Omotayo would send instructions to Scouts on how to divide the proceeds among the conspirators. At times, Omotayo also requested that Scouts give him lists of new business bank accounts they had opened and the conspirators then used these to facilitate future frauds. For this work, Eadie said, Omotayo received a 5 percent cut of each associated fraudulent transfer.

The jury heard from several victims of business email scams that Omotayo participated in. To illustrate: Paula Hall, the Controller at Gregory Manufacturing, a midwestern company that manufactures steel dumpsters, among other products, testified as to her experience. As Controller, Hall was responsible for paying the company's vendors and had full access to its bank accounts. On October 3, 2018, Hall received an email that she believed came from Mike Walker, the company's President. In reality, the actual (and unidentified) individual who contacted her that day by email was using a "spoof" account resembling Walker's real email address. The email directed Hall to pay an invoice for $32,460 to a false business partner, "Gekeem's SMA,"[1] and provided information for a Bank of America account that, unbeknownst to Hall, was controlled by

_____

[1] Eadie had persuaded one of his acquaintances, a DJ who went by the name "White Jesus," to open a business account for Gekeem's School of Musical Arts, a sham music school.

the conspirators. That same day, Omotayo contacted his Scout, Eadie, on WhatsApp to let him know to expect a transfer of $32,460.

Over the following week, Hall received two additional spoofed emails from the Walker account directing her to send wires totaling $143,800 to "Gekeem's SMA." She followed the scammers' instructions. Omotayo again messaged Eadie to let him know to expect the transfers and to instruct him as to how to divide the money. By October 15, when Hall discovered the scam, it was too late to recover the money.

Additional testimony at trial showed that Omotayo played a similar role in facilitating other frauds carried out in this fashion. No evidence was introduced that Omotayo himself interacted with the victim businesses.

C.    Trial Evidence of Aggravated Identity Theft

The aggravated identity theft charge against Omotayo related to his preparations, in one instance, to help prevent a bank from detecting a fraudulent transfer such as the one Hall made above. As described, banks would sometimes flag wire transfers as suspicious and freeze the conspirators' charade business bank accounts before the fraud's proceeds could be withdrawn and distributed. When a particular fraud was detected in this way, the conspirators would lose any funds remaining in the account and would also be forced to open new repository accounts. To help reduce these risks, Scouts sometimes prepared stories to tell bank employees who questioned the validity of the transfers.

Trial evidence showed that, on several occasions, Omotayo and Adelekan provided Scouts with documents, including invoices, that could be shown to bank employees if they became suspicious and started asking questions about the transactions. With regard to the aggravated identity theft charge, the government introduced evidence that, as part of a specific fraudulent transaction targeting the Canadian company JSS Medical Research ("JSS"), Omotayo "possessed" and "transferred" two invoices that

8

contained the name of a real JSS employee that he shared with a co-conspirator for this purpose.

The JSS fraud took place in August 2018, when JSS was preparing to pay one of its vendors, MKR Clinical Research Consultants ("MKR" or the "Vendor"). An unidentified Plug used a spoofed email account to pose as Michele Rubine, JSS's contact at the Vendor. On August 17, the Plug used the imitation Rubine account to email several JSS employees, asking that they send payment to an "alternate bank account." App'x 674. That bank account, of course, was one controlled by the conspirators.

On August 20, Omotayo sent Adelekan a WhatsApp message informing him that "[m]oney [would be] coming in from Canada." *Id.* at 1017. He also sent Adelekan a screenshot showing JSS's Montreal address. On the same day, JSS transferred $24,354.31 to a business bank account nominally associated with Hair Judgment, a salon owned by the girlfriend of co-conspirator Bryan Eadie. JSS's Chief Operating Officer, Stella Boukas, testified that JSS understood that it was sending the $24,354.31 to the Vendor.

On August 21, Omotayo sent his confederate Eadie a counterfeit invoice, prepared to show that JSS "owed" $24,361.31 to its Vendor, MKR. The bank information listed on the counterfeit invoice was for a Hair Judgment business account, not any of the Vendor's accounts. The business address listed for the Vendor was Eadie's home address. Omotayo later sent Eadie an updated version of the false invoice; it showed payment due to "MKR Clinical Research Consultants/Hair judgement [sic]." Supp. App'x 35.

Each of the two fabricated invoices directed "Bill To: Yulia Roytman." *Id.* at 33, 35. JSS's Chief Operating Officer testified that Roytman was a real project manager at JSS in August of 2018 and that JSS's project managers were responsible for reviewing invoices received from vendors.

9

The second, revised invoice is reproduced below. Roytman's name appears on the upper left side of the document.

 **MKR**
Clinical Research Consultants, Inc.

 # INVOICE

# 15768

**MKR Clinical Research Consultants/Hair judgement**
1845 Patterson Ave
Bronx, NY10473
mrubine@mkrclinicalconsultants.com

| | |
|---|---|
| Date: | Aug 1, 2018 |
| Payment Terms: | 15 days |
| Due Date: | Aug 16, 2018 |
| **Balance Due:** | **$ 24,364**.31 |

Bill To:

**Yulia Roytman**
JSS Medical Research
9400 Henri Bourassa W
Montreal, QC H4S 1N8
Canada

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **Billable Hours:JSS - Site Management** <br> Study: Pt-104 <br> Hours: Malcolm, Judith June2018 | 26.5 | $125.00 | $3,312.50 |
| **Monitoring:JSS - Monitoring** <br> Study: Pt-104 <br> Hours: Malcolm, Judith June2018 | 37.9 | $125.00 | $4,737.50 |
| **Billable Hours:JSS - Travel Hours** <br> Study: Pt-104 <br> Hours: Malcolm, Judith June2018 | 42 | $125.00 | $5,250.00 |
| **Expenses:JSS - PTC Expenses** <br> Study: Pt-104 <br> PTC: Malcolm, Judith June, July2018 | 1 | $11,064.31 | $11,064.31 |

| | |
|---|---|
| Subtotal: | $24,364.31 |
| Total: | $24,364.31 |

Wire Details:

Bank name: HSBC BANK
Account #: █0406
Routing #: █1088
Bank Address: 1499 West ave Bronx ,NY 10462
Swift (For international wire): MRMDUS33

**GOVERNMENT
EXHIBIT
521A**
19 Cr. 291 (LAP)

10

*Id.* at 35. During trial, Eadie explained that he believed Omotayo had sent him the false invoices to "verify in case the bank asks why . . . [he] receive[d] this $24,000." App'x 228. It is unclear from the record whether Omotayo himself manufactured the invoices or received them from some other source.

JSS made the $24,354.31 wire transfer to the Hair Judgment business account without having seen either invoice. Thereafter, HSBC Bank froze that account and returned the stolen funds to JSS. Ultimately, the parties agree, neither counterfeit invoice was ever provided to any bank, to JSS, or to the Vendor.

Omotayo's possession and transfer to Eadie of the invoices provided the sole basis for the government's aggravated identity theft charge against Omotayo.

### D.    Omotayo's Rule 29 Motion

At the conclusion of the evidence, Omotayo moved (as relevant here) for a judgment of acquittal as to the aggravated identity theft charge, arguing that the government had not introduced sufficient evidence proving that charge. In response, the government pointed to the August 21 invoices that Omotayo possessed and sent to Eadie, highlighting the appearance on those documents of the name of Yulia Roytman, a "real person who was an employee of JSS Medical Research." App'x 838. The government maintained that the appearance of Roytman's name and place of business on the fabricated invoices "could lead a rational juror[] to conclude that Mr. Omotayo used the means of identification of another in furtherance of the wire fraud conspiracy charged in Count One without lawful authority, 'without lawful authority' being because he was using it in furtherance of [the wire fraud conspiracy]." *Id.* at 839. The District Court denied Omotayo's motion for a judgment of acquittal as to Count Five without explanation.

11

E.      Closing Arguments and Jury Instructions

The government's closing argument on the aggravated identity theft charge again rested solely on the appearance of Roytman's name on the backup false invoices that Omotayo possessed. The government suggested that the co-conspirators purposefully chose the name of a real JSS employee to put on the invoice on the theory that, if bank employees ever saw the document, they might Google Roytman's name to see if she really worked at JSS. And if the bank "took it one step further and actually called JSS" to ask if Yulia Roytman worked there, the fraudsters "need[ed] to be sure that the bank was going to hear 'yes' to that [question]."App'x 922-23. In this way, the government maintained, the appearance of Yulia Roytman's name "further[ed] the fraud[.]" *Id.* at 922.

The district court then gave the jury its final instructions. On the aggravated identity theft charge, the court told the jury that it could find Omotayo guilty only if the government proved beyond a reasonable doubt that: (1) Omotayo "knowingly used, transferred, or possessed a means of identification of another person"; (2) his use, transfer, or possession was "in relation to the offense of wire fraud conspiracy charged in Count One of [the] indictment"; and (3) Omotayo "acted without legal authority." *Id.* at 967-68.

Regarding the second element, the court explained that "[a] person uses, transfers, or possesses a means of identification in relation to a crime if the means of identification had a purpose, role, or effect with respect to the crime." *Id.* at 969. As to the third element, the court told the jury that "'without lawful authority' means without authorization recognized by statute or regulation." *Id.* The court elaborated:

> To prove the "without lawful authority" element, the government need not prove that the means of identification [was] stolen. However, proof that [the] means of identification [was] stolen would satisfy the "without lawful authority" element. "Without lawful authority" includes situations in which a defendant comes into lawful possession of identifying information

12

and had the lawful authority to use that information for a lawful purpose but used the information for an unlawful purpose. "Without lawful authority" also includes situations where the person, whose identity was used in furtherance of a crime, consented to or gave permission for that use.

*Id.* at 969-70. The Court's jury instructions on the aggravated identity theft charge were substantively identical to those proposed by the government, to which Omotayo did not object.

### F.    Verdict, Sentencing, and Appeal

The jury convicted Omotayo on all three counts, and the district court sentenced him to forty-eight months on Counts One and Two. As to Count Five, the aggravated identity theft count, the court imposed on Omotayo the mandatory sentence of twenty-four months, to be served consecutive to the forty-eight month sentence he received on the other counts.[2] Because the sentence for Count Five had to run after completion of the sentence for Counts One and Two, 18 U.S.C. § 1028A(b), the court imposed an aggregate prison term on Omotayo of seventy-two months. The court also ordered Omotayo to pay $5,346,731.55 in restitution, as well as a $300 special assessment.

---

[2] Besides Omotayo, five defendants in this case were charged with aggravated identity theft, in addition to the wire fraud and money laundering conspiracy charges: Adelekan, Eadie, Olajumoke, Adebogun, and Oyeneyin. Omotayo and Adelekan were the only defendants who proceeded to trial. They were also the only defendants to be convicted on the count and to receive the associated twenty-four month mandatory sentence. As to three of the defendants (Olajumoke, Adebogun, and Oyeneyin), the government moved to dismiss the aggravated identity theft charges after each defendant agreed to plead guilty to another charge in the indictment. The remaining defendant, Eadie, who cooperated, pleaded guilty to two aggravated identity theft charges in addition to wire fraud and money laundering conspiracy charges. Upon a motion from the government, the court was permitted under 18 U.S.C. § 3553(e) to impose a sentence of imprisonment upon Eadie that was below the statutory minimum in recognition of his cooperation. It ultimately sentenced him to time served. (Eadie was released on bond the day of his arrest, so he was incarcerated for less than a day in total.)

Omotayo timely appealed his conviction on Count Five. He did not challenge his convictions on Counts One or Two.

In February 2023, Omotayo filed his opening brief on appeal. In it, he focused on the aggravated identity theft charge, arguing that the government's evidence was insufficient to establish (1) that he used, transferred, or possessed Yulia Roytman's name "during and in relation to" the wire fraud conspiracy, or (2) that he acted "without lawful authority."[3]

When Omotayo filed his opening brief, the Courts of Appeals were divided about the correct understanding of Section 1028A. One point of disagreement was about whether a defendant could be convicted of "using" a means of identification "in relation to" a crime without proof that he impersonated another person. The First and Ninth Circuits required that the defendant have "attempt[ed] to pass him or herself off as another person or purport[ed] to take some other action on another person's behalf." *United States v. Berroa*, 856 F.3d 141, 156 (1st Cir. 2017); *see United States v. Hong*, 938 F.3d 1040, 1050-51 (9th Cir. 2019). The Eleventh Circuit, on the other hand, rejected an impersonation test, instead focusing on "causation": whether the means of identification had "further[ed] or facilitate[d] the fraud." *United States v. Munksgard*, 913 F.3d 1327, 1334 (11th Cir. 2019) (internal quotation marks and citation omitted). The Sixth Circuit likewise rejected an impersonation test in favor of a causation test. *See United States v. Michael*, 882

---

[3] Omotayo also argued that the district court's jury instructions constructively amended the indictment. S4 alleged that Omotayo and Eadie "possessed and used the name and employer of [Roytman], without [her] authorization, in attempting to obtain through fraud the proceeds of a wire transfer . . . ." App'x 50. Omotayo contended that the indictment was constructively amended when (1) the government argued in closing that Omotayo "transferred" and "possessed" Roytman's identifying information, rather than that he "used" it; and when (2) the court instructed the jury that it could convict Omotayo of aggravated identity theft even if Roytman *had* authorized Omotayo to use her name. In light of our dispositions, we need address neither argument here.

F.3d 624, 627-28 (6th Cir. 2018). But it also explained that, at least in the health care fraud context, aggravated identity theft covered "whole cloth" misrepresentations about the identity of the patient, *id.* at 629, but not misrepresentations about "'*how* and *why*'" a patient had received certain services, *id.* at 628 (emphasis in original) (quoting *United States v. Medlock*, 792 F.3d 700, 707 (6th Cir. 2015)).

Omotayo argued that our Circuit's rule, set forth in *United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021),[4] required that the "use [of the means of identification] must at least facilitate—or be instrumental to—the predicate offense." Appellant's Br. at 30. The evidence at trial, he contended, did not show that the placement of the name "Yulia Roytman" on the invoice facilitated the fraud.

Omotayo also noted in his opening brief that the Supreme Court had granted *certiorari* on a case that had the potential to resolve the circuit split regarding Section 1028A. On June 8, 2023, the Supreme Court issued its decision in that case, *Dubin v. United States*, 599 U.S. 110 (2023). In *Dubin*, the Court held that a defendant violates Section 1028A "when [his] misuse of another person's means of identification is at the crux of what makes the underlying offense criminal[.]" *Id.* at 114. Section 1028A, the Court found, "targets situations where the means of identification itself plays a key role" in the fraud. *Id.* at 129.

Omotayo notified this Court of the *Dubin* opinion, and the government's opening brief and Omotayo's reply brief, both filed after *Dubin* issued, addressed whether the evidence against Omotayo met the standard articulated there.

---

[4] *Wedd* was decided in April 2021, about six months before the district court gave the jury its instructions in Omotayo's case.

**DISCUSSION**

Omotayo argues that the evidence that the government presented at trial was insufficient to support his conviction for aggravated identity theft because the use of Yulia Roytman's name on the backup invoices was not "at the crux" of the wire fraud conspiracy. We agree.

As an initial matter, the jury never found that Roytman's name met *Dubin*'s "crux" test: the jury was instructed that it could find Omotayo guilty of aggravated identity theft if Roytman's name had any "purpose, role, or effect with respect to the crime[,]" regardless of whether that purpose, role, or effect was at the crux of the underlying criminality. App'x 969. We determine whether a jury instruction is erroneous by looking to the legal standard that applies at the time of appeal. *See Henderson*, 568 U.S. at 269. In light of *Dubin*, the jury instruction was plainly erroneous. Further, on review of the record, we conclude that even if the jury had been instructed properly, the evidence at trial was insufficient to establish that Yulia Roytman's name played a "key role" in the wire fraud. We therefore reverse Omotayo's conviction.

**I.**      *Dubin* **established that Section 1028A(a)(1) does not extend to "ancillary" uses of a means of identification.**

*Dubin* is now the seminal case on Section 1028A. The defendant in that case, David Dubin, overcharged Medicaid by exaggerating the qualifications of an employee who performed psychological testing on patients and seeking reimbursement at a falsely elevated rate. *Dubin*, 599 U.S. at 114. The government indicted Dubin for healthcare fraud under 18 U.S.C. § 1347 and, based on his inclusion of his patients' names and Medicaid reimbursement numbers in the fraudulent bills, it also charged him with aggravated identity theft under Section 1028A. *Id.* at 114-15.

The question in *Dubin* was whether the defendant "used" his patients' means of identification "in relation to" his healthcare fraud. The Court observed that both terms— "use" and "in relation to"—had "indeterminate" meanings; each could be read broadly or narrowly, depending on the statutory context. *Id.* at 118-19 (internal quotation marks omitted). The government argued that the statute "cover[ed] any time another person's means of identification is employed in a way that facilitates" a predicated offense. *Id.* at 122. The Court disagreed, concluding that the statutory context did not support the government's "boundless" interpretation of each term. *Id.* at 114.

The Court looked first to the title of the statute: "Aggravated Identity Theft." *Id.* at 120-21. It pointed out that "[t]he government's broad reading . . . b[ore] little resemblance to any ordinary meaning of 'identity theft.'" *Id.* at 122. The phrase "'identity theft,'" the Court observed, "has a focused meaning": the "'fraudulent appropriation and use of another person's identifying data or documents[.]'" *Id.* (quoting Webster's Unabridged Dictionary xi (2d ed. 2001)); *see also id.* (quoting Black's Law Dictionary definition, which resembles the Webster's definition and says that "identity theft" is "[t]he unlawful taking and use of another person's identifying information for fraudulent purposes").

The Court also considered that Section 1028A is an "aggravated" offense, a term "suggest[ing] that Congress had in mind a particularly serious form of identity theft." *Id.* at 123-24. Under the government's proposed approach, by contrast, the statute "would apply an aggravated label to all manner of everyday overbilling offenses." *Id.* at 124 (internal quotation marks, citation, and alterations omitted). The Court's narrower interpretation was reinforced by Congress's inclusion of a "trio of verbs" in the statute ("transfers," "possesses," and "uses") that "capture various aspects of 'classic identity theft.'" *Id.* at 126 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 656 (2009)). The first two verbs, "transfers" and "possesses," connote the theft of personal information, while "'uses' supplies the deceitful use aspect." *Id.* at 126-27.

Further, the Court pointed out, a conviction based on Section 1028A operates as a "severe [enhancement]" that "adds a 2-year mandatory prison sentence onto underlying offenses that do not impose a mandatory prison sentence of any kind." *Id.* at 127. An overly broad reading would "collapse[] the enhancement into the enhanced[,]" turning the "great majority" of health care fraud cases into aggravated identity theft cases. *Id.* at 128. The Court also cautioned that "reading incongruous breadth into opaque language" in the statute would permit prosecutors to "hold the threat of charging an additional 2-year mandatory prison sentence over the head of any defendant who is considering going to trial." *Id.* at 130-31.

Thus, the Court determined that both "use" and "in relation to" took on more precise definitions in the context of Section 1028A. It read the phrase "in relation to" as "refer[ring] to offenses built around what the defendant does with the means of identification in particular." *Id.* at 122. That is, "the means of identification specifically [must be] a key mover in the criminality." *Id.* at 122-23. It accordingly rejected a broader "definition of 'in relation to' that just means facilitates or furthers the predicate offense in some way." *Id.* at 127, 131-32 (certain internal quotation marks and citation omitted). The Court also adopted "a more targeted definition of 'uses[,]'" requiring that the defendant have "use[d] the means of identification itself to defraud or deceive." *Id.* at 123. When a means of identification is "used deceptively," the Court explained, the deception "goes to 'who' is involved, rather than just 'how' or 'when' services were provided." *Id.* at 123. In sum, the Court held that a defendant "'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Id.* at 131.

To determine whether the "at the crux" test is met, *Dubin* establishes several requirements. First, the means of identification itself must be a "key mover" in the predicate crime, *id.* at 122-23; that is, it must play some integral role in the success of the

scheme. *See United States v. Avenatti*, No. 22-1242, 2024 WL 959877, at *4 (2d Cir. Mar. 6, 2024) (summary order) (affirming aggravated identity theft conviction where "identity theft was an essential part of [the defendant's] criminal conduct"), *cert. denied*, 145 S. Ct. 408 ( 2024); *see also* discussion *infra* note 12 (discussing how other circuits have applied this rule). Second, the government must show "more than a causal relationship, such as facilitation of the offense or being a but-for cause of its success."[5] *Dubin*, 599 U.S. at 131 (internal quotation marks and citation omitted). At least where the predicate offense is fraud, "the means of identification specifically must be used in a manner that is fraudulent or deceptive." *Id.* at 131-32. And this fraudulent use must be "at the locus of the criminal undertaking, rather than merely passive, passing, or ancillary employment in a crime." *Id.* at 123 (internal quotation marks and citation omitted); *see United States v. Cuomo*, 125 F.4th 354, 369 (2d Cir. 2025) (explaining that a defendant's use of victims' social security numbers amounted to aggravated identity theft where his use was "both fraudulent and deceptive," as the "entire [fraud] was about impersonating [the victims]" (internal quotation marks and citation omitted)); *United States v. De Los Santos*, No. 22-3164, 2024 WL 3041944, at *2 n.3 (2d Cir. June 18, 2024) (summary order) (holding that "the misuse of another person's means of identification was 'at the crux' of the fraud"

---

[5] As we have mentioned, Omotayo's opening brief relied in part on a then-recent decision by our Court: *United States v. Wedd*, 993 F.3d 104. In *Wedd*, we said that a defendant "use[s]" a means of identification "in relation to" a wire fraud where he "employ[s] or . . . avail[s] [him]self of a means of identification for a particular purpose" that "further[s] or facilitate[s] the fraud." *Id.* at 122-23 (internal quotation marks, citations, and alterations omitted). The government posits that this portion of *Wedd* is "no longer good law given *Dubin*'s statement that 'being at the crux of the criminality requires more than a causal relationship, such as facilitation of an offense.'" Appellee's Br. at 21-22 n.4 (quoting *Dubin*, 599 U.S. at 131). Omotayo, on the other hand, contends that *Dubin* "is consistent with, and lends considerable support to" *Wedd*. Rule 28(j) Letter, Dkt. 128 at 1. We need not decide whether *Dubin* overruled *Wedd*, as the government claims; affirmed it, as Omotayo says; or did something else, because, in any event, we must now follow the rule as articulated in *Dubin*.

where "the very nature of the scheme required the use of a person's identification"). Applying this test to Dubin's case, the Supreme Court concluded that his conduct did not fall within the ambit of Section 1028A, because the crux of Dubin's fraud "was a misrepresentation about the qualifications of [his] employee," and "[t]he patient's name was an ancillary feature of the billing method employed." *Dubin*, 599 U.S. at 132.

The *Dubin* Court focused on only one of the verbs in Section 1028A(a)(1): "uses." But as we earlier flagged, the statute also criminalizes the unlawful "transfer[]" or "possess[ion]" of a means of identification "in relation to" a predicate felony. 28 U.S.C. § 1028A(a)(1). Since Dubin was charged with unlawfully "using" his patients' identities, the Court did not need to "determine the precise metes and bounds" of the other verbs in the statute. *Dubin*, 599 U.S. at 125. It nonetheless provided guidance on how to construe "transfer" and "possess," in examining whether and how they may be distinct from "use." *Id.* at 125-27.

Both "transfer" and "possess," the Court observed, "connote theft" in the Section 1028A context. *Id.* at 125 (internal quotation marks omitted). Thus, "to unlawfully 'possess' something belonging to another person suggests it has been stolen." *Id.* For instance, a defendant's acts might qualify if he had "gone through someone else's trash to find discarded credit card and bank statements[.]" *Id.* at 126 (internal quotation marks and citation omitted). And "to unlawfully 'transfer' something belonging to another person similarly connotes misappropriating it and passing it along." *Id.* at 125. Here, the Court's example was a "bank employee who passes along customer information to an accomplice[.]" *Id.* at 126. Thus, the Court concluded that "transfer" and "possess" involve different "steps" of identity theft than "use": the theft and misappropriation of a means of identification. *Id.* at 126-27. The Court emphasized, however, that regardless of which verb is at play, a "means of identification" must do more than "facilitate[] or further" the

20

predicate offense—it must be "at the crux of the criminality." *Id.* at 127 (internal citation and quotation marks omitted).

## II.     In light of *Dubin*, the jury instruction was plainly erroneous

At the close of Omotayo's trial evidence, the district court instructed the jury that "[a] person uses, transfers, or possesses a means of identification in relation to a crime if the means of identification had a purpose, role, or effect with respect to the crime." App'x 969. In light of *Dubin*, this instruction was error.

Because Omotayo did not object to the jury instructions at trial, we review the instructions for plain error.[6] To reverse his conviction on this ground, we must find that "(1) there was error, (2) the error was plain, and (3) the error prejudicially affected [Omotayo's] substantial rights." *United States v. Torrellas*, 455 F.3d 96, 103 (2d Cir. 2006) (internal quotation marks and citation omitted). Where "all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Solano*, 966 F.3d 184, 193 (2d Cir. 2020) (internal quotation marks, citation, and alteration omitted).

*Dubin* explains that the "in relation to" element of Section 1028A is satisfied only if "the means of identification is at the crux of the underlying criminality[.]" *Dubin*, 599

---

[6] Omotayo's appellate briefs rest in part on *Dubin* but also do not argue that the jury instructions were improper—as noted, Omotayo filed his opening brief in this appeal before *Dubin* issued and, at the time, many courts used similar instructions. *See* sources cited *infra* note 7 (discussing how model jury instructions have changed after *Dubin*). While, in view of this silence in his opening papers, we would ordinarily consider any objection to the jury instructions to be waived, we have discretion to consider waived arguments "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004); *see also United States v. Regalado*, 518 F.3d 143, 149-50 (2d Cir. 2008). We think those circumstances are present here.

U.S. at 129. The prosecution in this case was held to a much less demanding standard: it could satisfy the "in relation to" element merely by showing that the means of identification had "a purpose, role, or effect with respect to the crime." App'x 969.

In light of *Dubin*, the jury instruction was plainly incorrect.[7] *See Henderson*, 568 U.S. at 273-74 (2013) ("[A]n error is 'plain' even if the trial judge's decision was plainly *correct* at the time when it was made but subsequently becomes incorrect based on a change in law." (emphasis in original)).

We also conclude that the error affected Omotayo's substantial rights: that is, we find that "there is a reasonable probability that the error affected the outcome of the trial." *Solano*, 966 F.3d at 193 (internal quotation marks and citation omitted). As a result of the erroneous instruction, the jury did not consider the evidence and all of the elements of the aggravated identity theft offense under the correct standard. As discussed above, the government's evidence that Omotayo's "transfer[], possess[ion], or use[]" of Roytman's

---

[7] It is thus no surprise that, after *Dubin*, judicial committees in at least two circuits have updatedtheir model jury instructions for aggravated identity theft. *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 15.9 (2022 ed., updated Nov. 2024) ("A means of identification is used 'during and in relation to' a crime when the means of identification is [transferred, possessed, or used] in a manner that is fraudulent or deceptive and is at the crux of what makes the conduct criminal."); Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.48C (2024) ("Identity theft is committed when a defendant uses the means of identification itself in a manner to defraud or deceive. It is not enough to be a violation of this law that the use of a means of identification was helpful or even necessary to accomplish the charged conduct unless the accused used that means of identification to deceive about the identity of the person performing the actions or receiving the benefits or services."); *see also* 2 Leonard B. Sand et al. Modern Federal Jury Instructions: Criminal ¶ 39A.10 (2024) (suggesting that, where an aggravated identity theft charge is "[i]n connection with fraud or deceit," a court should instruct the jury that "[t]he means of identification must be specifically used in a manner that is fraudulent or deceptive"); Manual of Model Criminal Jury Instructions for the District Courts of the Eight Circuit § 6.18.1028A cmt. (2023 ed., updated July 2023) (noting that the Eighth Circuit Committee "is considering what revisions are required to [its aggravated identity theft instruction] in light of *Dubin*").

name was "at the crux" of the fraud was limited. If the jury had been instructed under the correct standard, it might well have reached a different verdict.

Further, we are of the view that this error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 200. The jury convicted Omotayo of aggravated identity theft based on a far broader conception of Section 1028A than the law permits. This fact fundamentally undermines the fairness of Omotayo's conviction of this offense. We are therefore compelled to vacate Omotayo's conviction for the violation of § 1028A.

**III.    The government's evidence was insufficient to show that the invoice bearing Roytman's name was "at the crux" of the wire fraud conspiracy**

The erroneous jury instruction constitutes reversible error: on that basis alone, we could vacate Omotayo's conviction and remand for retrial. But where a defendant also challenges the sufficiency of the evidence supporting his conviction, we "generally requir[e] reviewing courts to consider preserved sufficiency challenges before ordering retrials based on identified trial error." *Hoffler v. Bezio*, 726 F.3d 144, 162 (2d Cir. 2013).[8] Because a "reversal on the basis of insufficiency of evidence, like an acquittal, bars a

---

[8] We recognize that, in at one recent case, this Court declined to consider a sufficiency challenge where the Supreme Court had reversed longstanding Circuit precedent and "invalidate[d] a legal theory that formed the basis" for the government's case, and where the government told the Court that it could "offer new evidence" to prove the defendant's guilt under another theory. *United States v. Aiello*, 118 F.4th 291, 301-02 (2d Cir. 2024). We explained that "when trial error is caused by a subsequent change in the governing law, we may decline to review preserved sufficiency challenges if such a review 'would deny the government an opportunity to present its evidence' under the correct legal standard." *Id.* at 303 (quoting *United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011)). In Omotayo's case, however, the government has not asked this Court to disregard Omotayo's sufficiency challenge—indeed, that was the primary issue raised in his appeal. Nor has it urged that it should have an opportunity to retry Omotayo if his Section 1028A conviction is vacated. We therefore conclude that a sufficiency review is warranted here, absent "sound reasons for refusing" to consider Omotayo's sufficiency argument. *Bruno*, 661 F.3d at 743.

retrial, . . . a reversal of a conviction on grounds other than sufficiency does not avoid the need to determine the sufficiency of the evidence before a retrial may occur." *United States v. Wallach*, 979 F.2d 912, 917 (2d Cir. 1992) (internal citation omitted). We therefore turn to Omotayo's argument that the government's evidence was insufficient to support his aggravated identity theft conviction. We agree with Omotayo: after *Dubin*, the government's evidence fell short.

A.  Omotayo's transfer and possession of Roytman's name was "ancillary" to the wire fraud conspiracy

As a preliminary matter, we note that Omotayo's conviction for aggravated identity theft in this case must be premised on his "possession" and "transfer" of Roytman's name, rather than his "use." The evidence at trial was that Omotayo never showed the invoice to the bank or to any other person besides Eadie, the co-conspirator to whom Omotayo transferred the document. So we cannot say that the invoice was "used" without giving that term an unworkably broad meaning, one that would render the words "possess" and "transfer" largely superfluous in the statute. *See Berroa*, 856 F.3d at 156 (cautioning that "in [the Section 1028A] context, 'use' cannot be given its broadest possible meaning, which would subsume the separate statutory terms 'transfer' and 'possess'" (internal alterations omitted)); *Dubin*, 599 U.S. at 126 (instructing that each verb in Section 1028A should be interpreted as having a "particular, nonsuperfluous meaning" (internal quotation marks and citation omitted)).

Based on the evidence introduced at trial, no reasonable jury could conclude that Omotayo's possession or transfer of Roytman's name was "at the crux" of the fraud. The invoice was not a central part of the conspirators' scheme. Eadie testified that Omotayo sent the invoice to him (Eadie) as part of a contingency plan: If the bank asked questions about why $24,354.31 was transferred into the Hair Judgment account, Eadie could show

24

them the invoice. In many cases, including the attempted JSS fraud, the conspirators never needed to show the relevant bank any documents at all.

Further, for Section 1028A to be violated in this setting, it is not the invoice that must be "at the crux" of the fraud, but the "means of identification"—here, Roytman's name. The government fell far short of showing that the appearance of Roytman's name itself on the backup invoice was a "key mover" in the fraud. *Dubin*, 599 U.S. at 123. As discussed, the primary purpose of the invoice was to persuade the bank, "in case" it asked, App'x 228, that Hair Judgment was the vendor that had performed work for JSS meriting a transfer of $24,364.31. Each invoice was complete (payee, payor, service rendered, date, amount) even without Roytman's name.

The government offers several theories as to how including the name of a real JSS employee might have "advanced" the fraud by increasing the credibility of the invoice. Appellee's Br. at 21. It speculates, for instance, that the appearance of Roytman's name on the invoice "ensured that any bank representative who investigated the matter would learn not only that the invoice listed a real JSS employee, but that it listed a JSS employee who, as a project manager, was authorized to receive and review invoices from MKR." *Id.* In its closing argument to the jury, the government described hypothetical scenarios in which bank employees would Google Roytman's name or call JSS to verify that she worked there. But the government introduced no evidence to support the notion that the bank would make so much of appearance of the specific employee's name on an invoice like this one. We can just as easily imagine that the bank would have overlooked Roytman's name entirely, focusing on the other information contained in the document. And even if we presume that placing Roytman's name on the invoice might have marginally "advanced" the conspirators' fraud, *id.* at 21, *Dubin* teaches that "being at the

25

crux of the criminality requires more than . . . facilitation of the offense," 599 U.S. at 114 (internal quotation marks and citation omitted).[9]

As a useful point of comparison, we can look to the evidence the government used to convict Omotayo's co-defendant Adelekan of aggravated identity theft. At trial, the government introduced evidence regarding a different plan of the conspirators, one to defraud a venture fund. As part of this scheme, a Plug exchanged emails with the venture fund's bank using a spoofed email account that resembled that of Steve Girsky, one of the fund's managing members. A banker responded to the emails, informing the faux-Girsky that the bank required verbal confirmation before processing a wire transfer. The banker testified that the bank always confirms requested wire transfers by phone before sending, to allow verification of the customer's identity by posing security questions.

Adelekan shared the banker's emails with Eadie and asked him to impersonate Girsky on the expected confirmation call. To ensure that Eadie could answer the bank's questions, Adelekan gave him Girsky's real name, address, social security number, and date of birth. Eadie testified that he refused to take part in this plan because he "didn't want to get involved in doing that." App'x 291.

We need not decide whether this evidence was sufficient under *Dubin* to support Adelekan's conviction for aggravated identity theft; that issue is not before us in this appeal.[10] Adelekan's use of Girsky's identifying information nevertheless reveals some

---

[9] The record likewise contains no evidence that the false invoice—had it been shown to anyone—would have played a role in convincing JSS to make the wire transfer in the first place. To the contrary, a JSS employee testified that she would have recognized the invoice as fraudulent had she seen it.

[10] Adelekan appealed his conviction on other grounds, and, on October 16, 2024, a different panel of this Court affirmed the district court's judgment. *See United States v. Adelekan*, No. 22-1232-CR, 2024 WL 4501962 (2d Cir. Oct. 16, 2024).

of the elements that are missing from the case that was presented against Omotayo. For Adelekan, impersonating Girsky on the confirmation call was not a backup plan—it was essential to the fraud. The banker told the conspirators that he would process the wire transfer only after speaking to Girsky. *Cf. Avenatti*, 2024 WL 959877, at *4 (holding that defendant's use of means of identification was at the crux of criminal conduct where the defendant forged his client's signature after learning that he could not steal funds from her without her signoff). It was Girsky's identifying information, moreover, that the fraudsters needed to complete this part of the plan. The banker testified that he would have used the confirmation call to ask, among other things, for Girsky's date of birth and social security number.

As the planned Girsky fraud illustrates, many of Omotayo's coconspirators impersonated or attempted to impersonate real people as part of the larger scheme. Some of the fraudsters (the Plugs) used hacked or spoofed email accounts to pretend to be employees of legitimate businesses in order to defraud those businesses, their banks, and their business partners. Indeed, in the JSS scam, a Plug impersonated an employee of JSS's Vendor in a successful attempt to persuade JSS to wire funds to the conspirators' bank accounts. But there is no evidence that Omotayo himself ever communicated with anyone at JSS, the Vendor, or the bank (or with anyone else besides his co-conspirators), or presented the invoice to anyone else outside the conspiracy. Both at trial and in this appeal, the government's argument that Omotayo violated Section 1028A relied exclusively on his possession and transfer to his coconspirator Eadie of Roytman's name on the counterfeit invoices during the JSS transaction.

Omotayo's role in the JSS fraud was to ensure that fraudulent funds were successfully transferred into and distributed from bank accounts controlled by the conspiracy. It was not to impersonate real employees in order to defraud businesses. His conduct made him criminally liable for conspiracy to commit wire fraud and money

laundering. But to convict him under Section 1028A, as charged, the government's burden was to show that Omotayo's *own* transfer, possession, or use of a means of identification—here, Roytman's name—was at the crux of the JSS wire fraud scheme. It has not done so.

B.    The government's efforts to distinguish this case from *Dubin* are unpersuasive

The government advances several responses. First, it argues that the facts of this case are distinguishable from those in *Dubin*, because Royman's name "had been stolen" by hackers who infiltrated JSS's system or that of its Vendor. Appellee's Br. at 18. Where a means of identification is "stolen or misappropriated," the government asserts, a Section 1028A offense "may be premised on the defendant's unlawful transfer or possession—rather than use—of a means of identification." *Id.* at 12.

Even if mere possession or transfer of a stolen means of identification could support a Section 1028A conviction, the record here leaves uncertain whether the jury found that Roytman's name was "stolen." The jury was instructed that the government needed to prove three elements beyond a reasonable doubt to establish aggravated identity theft: that (1) the defendant "knowingly used, transferred, or possessed a means of identification of another person"; (2) the defendant did so "in relation to the offense of wire fraud conspiracy charged in Count One of [the] indictment"; and (3) the defendant "acted without legal authority." App'x 967-68. To establish the "without lawful authority" element, the trial judge explained, the government could prove either that the "means of identification [was] stolen" or that Omotayo "[came] into lawful possession of identifying information and had the lawful authority to use that information for a lawful purpose but used the information for an unlawful purpose." *Id.* at 969-70. So it is unclear whether the jury's guilty verdict on Count Five reflects a finding that Roytman's name was stolen, or that Omotayo acquired Roytman's name in a lawful manner—by Googling,

perhaps—but then put it to an unlawful purpose. The government posits that conspirators "plainly" obtained Roytman's name "from a legitimate invoice discovered [after hacking] a compromised email account." Appellee's Br. at 18. But the government elicited no testimony and submitted no other proof as to the origins of the invoice. We therefore conclude that the evidence was insufficient to support the theory that Roytman's name came from a stolen invoice.

The government next contends that *Dubin* "requires [no] more" than that Omotayo have employed Roytman's name "'in a manner that [was] fraudulent or deceptive.'" *Id.* at 21 (quoting *Dubin* 599 U.S. at 132). The invoices meet this standard, the government asserts, because Omotayo intended to use Roytman's name "to deceive the bank about 'who was involved' in reviewing and approving the relevant wire transfer on JSS's behalf." *Id.* (internal alteration and certain quotation marks omitted) (quoting *Dubin*, 599 U.S. at 123). Or, as counsel for the government put it during oral argument, the invoice falsely suggested that "[Roytman] approved the wire transfer" to the conspirators' bank account. Oral Argument at 14:27-34.

Even positing, however, that the government is correct as to why Roytman's name appeared on the invoice—a question the jury was not asked to consider—we do not agree that *any* fraudulent or deceptive use of a name necessarily goes to the "crux" of an underlying fraud. The government relies on the following language in *Dubin*:

> A defendant "uses" another person's means of identification "in relation to" a predicate offense when this use is at the crux of what makes the conduct criminal. To be clear, being at the crux of the criminality requires more than a causal relationship, such as facilitation of the offense or being a but-for cause of its success. Instead, with fraud or deceit crimes like the one in this case, the means of identification specifically must be used in a manner that is fraudulent or deceptive. Such fraud or deceit going to identity can often be succinctly summarized as going to "who" is involved.

*Dubin*, 599 U.S. at 131-32 (internal quotation marks, citation, and footnote omitted). As the quoted paragraph shows, the Supreme Court has recognized fraudulent use of a means of identification as a necessary element of at least some aggravated identity theft convictions: namely, those premised on "use" of a means of identification and for which the predicate felony involves "fraud or deceit." *Id.* But we do not take *Dubin* to mean that any deceptive reference to a name, no matter how ancillary to the underlying crime, necessarily constitutes aggravated identity theft. *Dubin* also emphasized that "the means of identification specifically [must be] a key mover in the criminality." *Id.* at 122-23. And, as we have explained, the mere appearance of Roytman's name on a fraudulent invoice that Omotayo showed only to his coconspirators was hardly a "key mover" in the wire fraud scheme. [11]

Thus, the government's efforts to distinguish the facts of this case from those of *Dubin* are unpersuasive. There are, of course, pertinent differences. Perhaps the jury could have found, based on the limited trial evidence about the invoices transferred by Omotayo, that some of the information on the invoices may have been stolen by hackers. And, arguably, any banker who saw the invoice might conceivably interpret Roytman's name as an indication she had approved the transaction. Neither of these points alters the fundamental flaw in the government's post-*Dubin* case: that the invoices themselves, and Roytman's name in particular, were not at the crux of the wire fraud.

---

[11] We also caution that the government's approach risks greatly expanding the scope of Section 1028A, a result contrary to the Supreme Court's warnings in *Dubin*. A document's inclusion of a name may give a loose impression that the named person approved that document. For instance, considering the facts in *Dubin*, one could argue that the reference to the patients' names on Medicaid bills suggested that the patients had approved the charges. Adopting the government's view would quickly trample over the limits the *Dubin* Court sought to impose on aggravated identity theft prosecutions.

C. Since *Dubin*, other circuits have also held that the means of identification must be critical to the underlying fraud

Our conclusion is consistent with our sister circuits' recent applications of *Dubin*. In *United States v. Ovsepian*, for instance, the Ninth Circuit considered whether a defendant committed aggravated identity theft by keeping a patient's health care file "without her authorization" so that the defendant's medical clinic, which was engaged in health care fraud, could "protect against a possible audit." 113 F.4th 1193, 1208 (9th Cir. 2024). While maintaining the patient's health care file on site "may have lent [the clinic] the air of legitimacy and thereby helped [it] to survive an audit," the court explained, the defendant's possession was "not at the 'crux' of the conspiracy to commit healthcare fraud." *Id.* Rather, it was "an 'ancillary feature' of the scheme that merely facilitated its commission.'" *Id.* The Ninth Circuit also noted that, because the government had made a "strategic choice" to base its Section 1028A prosecution on Ovsepian's possession of a single patient's file, it would not consider whether other conduct constituted aggravated identity theft. *Id.* The Ninth Circuit thus reversed the district court's denial of Ovsepian's 18 U.S.C. § 2255 habeas petition and directed the district court to vacate his judgment of conviction and sentence on the aggravated identity theft count.

By contrast, in *United States v. Croft*, the Fifth Circuit considered whether the owner of a police dog handling and training school committed aggravated identity theft when he prepared and submitted a certification application that falsely represented that four qualified trainers would be serving as instructors at his school. 87 F.4th 644, 646 (5th Cir. 2023). The government introduced evidence that "the roster of instructors and their qualifications was 'particularly important'" to the certification application. *Id.* at 649 (quoting trial testimony). Those same misrepresentations about the identity of his instructors were "the basis" for the defendant's conviction for the predicate felony of wire

fraud. *Id.* The inclusion of the four instructors *was* the "material misrepresentation[]" on the certification applications that Croft submitted. *Id.* Thus, the court concluded, the use of the instructors' names was "at the crux of what made the underlying conduct fraudulent." *Id.* (internal alterations adopted; internal quotation marks and citation omitted). It affirmed the defendant's conviction.[12]

These cases are instructive here. As in *Ovsepian*, Omotayo's placement of the name Yulia Roytman on the contingency document served an ancillary purpose: for possible

---

[12] Like the *Croft* court, since *Dubin*, this Circuit and others have affirmed Section 1028A convictions where a defendant's deceptive use of another person's identity was "an essential part of [the defendant's] criminal conduct." *Avenatti*, 2024 WL 959877, at *4 (concluding that attorney violated Section 1028A where he forged his client's signature on a letter "for the purpose of wrongfully obtaining her money" after "his client's literary agent refused to allow the diversion unless the client authorized it"); *see, e.g., Cuomo*, 125 F.4th at 369 (concluding that employee of a debtor research company violated Section 1028A where his "entire [fraud] was about impersonating debtors" on state unemployment websites "so that states would falsely recognize [his employees] as the target debtors and provide . . . [the debtors'] restricted [place of employment] information," which the company would then sell (internal quotation marks and citation omitted)); *Carter v. United States*, No. 22-12744, 2024 WL 20847, at *9 (11th Cir. Jan. 2, 2024) (concluding that superintendent of a school violated Section 1028A where he misrepresented which students were enrolled at his school, and this "forgery of the students' identities" was "at the heart" of his fraudulent scheme to increase his school's state funding (internal quotation marks and citation omitted)); *United States v. O'Lear*, 90 F.4th 519, 533 (6th Cir.) (concluding that owner of mobile x-ray company violated Section 1028A where he "forged the signatures of a physician and an x-ray technician to make it appear as if these individuals had ordered or conducted the x-rays he billed for" as part of a "scheme to bill for fictitious x-rays"), *cert. denied*, 144 S. Ct. 2542 (2024); *United States v. Thomas*, No. 23-1030, 2024 WL 4224910, at *2 (9th Cir. Sept. 18, 2024) (concluding that secretary for a drainage district violated Section 1028A where she forged a commissioner's signature on fraudulent payment requests, because the forged signature was "necessary . . . to obtain payments from the County, and thus it was at the 'crux' of the crime"); *United States v. Gladden*, 78 F.4th 1232, 1245, 1248 (11th Cir. 2023) (concluding that pharmacy employee violated Section 1028A where she used the identities of two patients "to continue refilling prescriptions in their names, even though they were neither aware of nor received any products," but another employee did not violate Section 1028 where he obtained "medically unnecessary prescriptions" but did not "misrepresent who received the prescriptions").

use if a bank might ask questions about the wire transfer. If a bank did so, Eadie could present the invoice and, as the government posits, the appearance of Roytman's name might lend "an air of legitimacy" to the invoice. *Ovsepian*, 113 F.4th at 1208. But Omotayo's use of Roytman's name was not crucial in comparison to what the Fifth Circuit relied on in *Croft*. While, depending on the bank's response, the document bearing Roytman's name could have been useful to the success of the scheme, the government's evidence did not show that this backup detail was "particularly important" to—*i.e.*, at the crux of—the conspirator's scheme. *Croft*, 87 F.4th at 649. Nor was the fraudulent invoice the "basis" for Omotayo's underlying conviction for conspiracy to commit wire fraud. *Id.* The fraud conviction could stand without any evidence regarding the invoice.

\* \* \* \* \*

In sum, Omotayo's possession and transfer of Roytman's name did not "play[] a key role" in the fraud that "warrants a 2-year mandatory minimum." *Dubin*, 599 U.S. at 129. The invoices bearing Roytman's name were intended to serve as part of a contingency plan, and, indeed, although the particular JSS fraud came close to being accomplished, the invoices were never used. Roytman's name had even less importance than the invoices themselves. We should not permit the Roytman invoices to become the "tail which wags the dog" of Omotayo's underlying fraudulent conduct. *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) (internal quotation marks and citation omitted). The two-year mandatory sentence is intended for a "particularly serious form of identity theft," the Supreme Court has taught. *Dubin*, 599 U.S. at 124. We have been cautioned against reading Section 1028A in a manner that turns the "core" of this serious identity theft offense "into something the ordinary user of the English language would not consider identity theft at all." *Id.* The government's proposed extension of Section 1028A would encompass many offenses—including Omotayo's "possession" and "transfer" of Roytman's name—that fall far outside the conduct targeted by the statute.

33

## CONCLUSION

For the reasons set forth above, we **REVERSE** the judgment of Omotayo's conviction as to the aggravated identity theft count, 18 U.S.C. § 1028A, and **REMAND** with directions to the district court to enter a judgment of acquittal on that count and for further proceedings not inconsistent with this opinion. The Clerk is directed to issue the mandate forthwith.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

I agree with the majority that the district court's jury instruction concerning the crime of aggravated identity theft is now plainly erroneous in light of *Dubin v. United States*, 599 U.S. 110 (2023). But I do not agree that *Dubin* requires a reversal of Temitope Omotayo's conviction for that offense. Because Omotayo did not object to the jury instructions at trial, he must establish not merely that there was plain error, but that there was "fundamental error" – error that prejudicially affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *DeFalco v. Bernas*, 244 F.3d 286, 317 (2d Cir. 2001). To my mind, he has not done so. Indeed, based on the evidence introduced at trial, I am confident that a properly instructed jury would have unanimously concluded that Omotayo's possession and transfer of Yulia Roytman's name on fraudulent invoices played a key role in the conspiracy to commit wire fraud and that the use of her means of identification was "at the crux" of what made the conduct criminal. *Dubin*, 599 U.S. at 131. I would therefore affirm the district court's judgment.

As explained by the majority, *Dubin* established that under 18 U.S.C. § 1028A(a)(1), "a defendant 'uses' another person's means of identification 'in

relation to' a predicate offense when the use is at the crux of what makes the conduct criminal," and where "a defendant uses the means of [stolen] identification itself to defraud or deceive." *Id.* at 113–14, 123. When the underlying crime involves fraud or deceit, it is not sufficient that the "use" of a means of identification is a "mere ancillary feature" of the scheme; instead, the identification must be used "specifically in a fraudulent or deceitful manner." *Id.* at 117.

Omotayo's conduct clearly satisfies this standard. Unlike in *Dubin*, where the government argued that section 1028A(a)(1) was automatically satisfied because the petitioner's overbilling scheme included the use of invoices confirming patients' names, the misrepresentation here was at the crux of the charged fraud and "integral to what made the conduct fraudulent." *Id.* at 131. This is because the use of Roytman's identification was intended to mislead bank officials who might otherwise have thwarted Omotayo's scheme to defraud his victims. Such use was undeniably "fraudulent or deceitful" in nature. *Id.*

In order for the wire-fraud scheme underlying the conspiracy charged in Count One to succeed, Omotayo and his co-conspirators needed to deceive two distinct parties: (1) the victim companies duped into approving the transfer of funds from their accounts and (2) the banks that received the fraudulent transfer

2

requests and executed the wire transfers to the co-conspirators' bank accounts. The scheme could not be completed until funds were wired from the JSS Medical Research account to the bank account opened by Omotayo's co-conspirators; only then would the co-conspirators be able to access these funds. *See United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013) ("[A] scheme to defraud is not complete until the proceeds have been received." (internal quotation marks omitted)).

In *Dubin*, the Court found that the defendant's use of patients' names was merely "an ancillary part of the Medicaid billing process" in the petitioner's scheme to overbill for medical testing, since the testing was in fact performed on the patients in question. 599 U.S. at 114. In other words, the deception had nothing to do with the patients' identities. Here by contrast, the possession and transfer of Roytman's name and employer were "integral to what made the conduct fraudulent," because it was intended to lull the bank into believing that Roytman had actually approved the fraudulent transactions. *Id.* at 118. Omotayo's co-conspirator (Bryan Eadie) himself testified that the fake invoices bearing Roytman's name were prepared so that Eadie and his girlfriend would have them on hand in case the bank inquired about the legitimacy and purpose of the JSS wire transfer. *See* App'x at 667–69, 677–80.

3

The majority contends that "no reasonable jury could conclude that Omotayo's possession or transfer of Roytman's name was 'at the crux' of the fraud" because the invoices bearing Roytman's name were "intended to serve as a part of a contingency plan" and were ultimately "never used." Maj. Op. at 35. But liability under section 1028A(a)(1) does not require that the government prove that anyone was actually deceived or misled, and no language in the statute suggests that someone must be deceived or harmed. It is sufficient that Omotayo possessed these documents with Roytman's information for the purpose of "obtain[ing] through fraud the proceeds of a wire transfer, during and in relation to the conspiracy to commit wire fraud charged in count One." App'x at 50. The fact that bank employees ultimately did not ask Omotayo or his co-conspirators to provide documentation to verify the JSS transfer does not make the possession and transfer of Roytman's name and employer on a fraudulent invoice any less criminal. And I have no doubt that a properly instructed jury would have come to the same conclusion and convicted Omotayo even though the invoices were never actually used.

Further, the majority's focus on whether the invoice was used or whether the bank requested the invoice ignores the fact that section 1028A applies to

4

inchoate offenses like conspiracy or attempt.[1]  I do not read *Dubin* to in any way foreclose the application of section 1028A to such crimes.  To the contrary, the Court's discussion of the verbs "possess" and "transfer" reflect the temporal components of aggravated identity theft.  In particular, "possesses" encompasses a defendant's wrongful acquisition of another's means of identification before he has "put it to use or transferred it elsewhere," while "[t]ransfers" refers to a defendant's conveyance of the identification to another person or location where it can be put to use.  *See Dubin*, 599 U.S. at 125 n.7 (internal quotation marks omitted).  The majority's conclusion that the invoices could not be at the "crux" of the scheme because they were never used belies this understanding and misreads *Dubin* by not considering the inchoate crimes committed by Omotayo.

Finally, because I believe that Omotayo's "possession" and "transfer" of Roytman's name was "at the crux" of what made his conduct criminal, I cannot agree that affirming Omotayo's conviction would improperly "extend" section 1028A to encompass "many offenses" that "fall far outside the conduct targeted

---

[1] Section 1028A applies to "any felony violation enumerated in subsection (c)," 18 U.S.C. § 1028A(a)(1), and section 1028A(c)(5) identifies "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)" as such a predicate felony.  18 U.S.C. § 1349 – which appears in chapter 63 – is titled "Attempt and conspiracy," and states that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

5

by the statute." Maj. Op. at 35. Omotayo's deceptive conduct was a "serious form of identity theft" because he possessed and used Roytman's identity for the express purpose of deceiving others, namely the banks that received the fraudulent transfer requests and executed the wire transfers to the co-conspirators' bank accounts. *Dubin*, 599 U.S. at 124. In *Dubin*, the Supreme Court found that the government's expansive reading of section 1028A would "turn the core of worse or more serious identity theft into something the ordinary user of the English language would not consider identity theft at all," and cautioned that such a reading would implicate a "vast array of offenses." *Id.* at 122 (internal quotation marks omitted). That is not a problem in this case. Here, the government's reading of section 1028A falls squarely within the "ordinary understanding" of identity theft, *id.* at 124, and Omotayo's behavior was just the type of conduct targeted by the statute. And contrary to the majority's characterization, Roytman's name was not the "tail which wags the dog" of Omotayo's underlying fraudulent conduct, but rather a key part of the deception. Maj. Op. at 35. Accordingly, I would hold that Omotayo's aggravated identity theft conviction under section 1028A satisfies the standard set forth in *Dubin.*

\*　　\*　　\*

For all these reasons, I respectfully dissent from the majority's opinion and would affirm the district court's decision as to Omotayo's conviction for aggravated identity theft under section 1028A.